**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 20-cr-247-1 |
| | ) | |
| ROLAND BLACK | ) | Hon. Steven C. Seeger |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Roland Black got into a car accident with another driver on the streets of Chicago. The collision brought together two drivers who should not have been driving at all. Black had a warrant out for his arrest. The other driver had a suspended license.

Given that reality, one might think that the two drivers would want to keep things on the down low, and resolve the situation between themselves. Attracting the attention of law enforcement may not have been the best idea. Maybe they could have exchanged information, called it a day, and gone on their way.

Black had other ideas. He decided to get the police involved. He flagged down nearby officers from the Chicago Police Department and asked for their help with the fender bender. That decision was risky, and not just because of the active warrant. As it turns out, Black was a convicted felon with a loaded handgun in his car.

So a convicted felon with a handgun and a warrant out for his arrest waved at the police and asked them to lend a hand. The police did more than lend a hand. It did not take much detective work for the police to figure out that a warrant was out for Black's arrest.

The officers promptly placed Black under arrest. At that point, the police needed to figure out what to do with his car. He didn't have any passengers, and no one else was on hand to drive the vehicle. And Black's car couldn't stay where it was.

After the accident, Black pulled his car to the side of the road, in a metered parking spot, but the car was not legally parked. He put the car a few feet from the curb. So the car was across the white line on the side of the road, and was sticking out in the street.

The police decided to tow the car. Before impounding the vehicle, an officer performed a brief search. And before long, the officer located the loaded handgun in the center console between the driver's seat and the front passenger seat.

That discovery led to charges in state court, and led to the case at hand, too. Black was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Black, in turn, moved to suppress the firearm recovered during the search of his car.

For the following reasons, Defendant's motion to suppress is denied.

## Background

The Court summarizes the facts based on the material in the record, including the body-worn cameras and testimony given at a suppression hearing in state court. A district court can make factual findings when ruling on a motion to suppress. *See United States v. Cole*, 21 F.4th 421, 427 (7th Cir. 2021) (en banc); *United States v. Gholston*, 1 F.4th 492, 496 (7th Cir. 2021).

On February 11, 2017, Defendant Roland Black was driving a gray Lexus SUV on 35th Street in Chicago. *See* State Mtn. to Suppress Transcript, at 11:14-19 (Dckt. No. 26-1). He got in a fender bender with another driver, who rear-ended Black's car.

By the look of things from the video, there wasn't much noticeable damage to Black's car. Maybe there was some damage to the back of the car, but it wasn't smashed up. It was drivable, too. The other car had a banged-up hood. The accident was a bumper buster, at most.

Black and the other driver then flagged down Officers Giesel and Clay from the Chicago Police Department to assist with the accident. *Id.* at 7:9 – 8:10. At the time, both cars were in

the middle of 35th Street. *Id.* 8:9-12. The officers told them to move their cars to the side of 35th Street. *Id.* at 9:10-17, 12:2-7.

Black moved his car from the middle of 35th Street and put it on the side of the road. A parking spot was there for the taking. A spot was open right next to a parking meter. The body-camera footage shows the tall black box used to pay for parking, with the large "P" in a green circle. *See* Giesel Video, at 0:14, 1:04.[1] All Black had to do was parallel park.

But Black did not do the world's best parking job. Far from it. He parked the car largely – but not entirely – in a parking spot with a meter. The car was over the line and in the road. *See* State Mtn. to Suppress Transcript, at 31:7-8, 32:6-11, 34:23 – 35:4, 35:21 – 36:5, 37:6-23, 42:13-15 (Dckt. No. 26-1).

When Black was done parking, the officers asked him for his driver's license. *Id.* at 12:2-7, 13:17-21. That's when Black's day went from bad to worse.

The police quickly saw that Black had an active warrant out for his arrest. *Id.* at 13:13-24. The officers verified the warrant and then arrested Black. *Id.* at 15:2-8, 21:22 – 22:3.

While searching Black incident to arrest, the officers found a large quantity of cash on his person. *See* Giesel Video, at 2:06-40. The videos show the officers pulling out huge wads of cash, totaling more than $5,000.[2] *See* Incident Report (Dckt. No. 46-2, at 4 of 4). They pulled out bundle after bundle, prompting expletives from the police. *See* Giesel Video, at 2:06-40.

---

[1] The government submitted a CD to the Clerk's Office with the video from the body-worn cameras. *See* Dckt. Nos. 44, 45.

[2] The officers learned that Black had an active warrant for his arrest. The Incident Report reveals that the warrant was for unlawful delivery of a controlled substance. *See* Incident Report (Dckt. No. 46-2, at 4 of 4). The Court does not know if the arresting officers knew the nature of the warrant at the time of his arrest (as opposed to later, when an officer wrote the Incident Report). At the beginning of the videos, one of the officers informed Black that there was a warrant out for his arrest. Black responded: "For what?" *See* Giesel Video, at 0:32-37. The officer responded: "I don't know what, but you got a warrant, man." *Id.* Even so, the government does not argue that the nature of the warrant – and the discovery of over $5,000 in cash on Black's person – created probable cause to search the car.

Officer Clay patted down Black and found the keys to his car. *See* Clay Video, at 2:12-16. The officer asked Black whether his car was "still drivable 'cause it has to come to the station." *Id.* at 2:15-18.

Meanwhile, the officers also learned that other driver was driving on a suspended driver's license. *See* Giesel Video, at 0:39-42. So he wound up at the police station, too.

After placing Black under arrest, the officers needed to figure out what to do with his car. Black did not have a passenger in the car, and no one else was on the scene to take the keys and drive the car.

The car could not stay where it was. Black put his car on the side of the road, but the car was too far from the curb. The car was over the white line and in the street, blocking part of the bike path.

Maybe Black was nervous or flustered because the police were on hand. Maybe he was in a hurry. Or maybe he thought that the parking spot was temporary. Whatever the reason, Black pulled his car to the side of the road, but did not pull off the parallel parking.

By the look of things, Black angled-in to the parking spot, and simply left it crooked. The front half of the car was closer to the curb than the back half of the car. The back right tire (on the passenger side) was several feet from the curb. The back left tire (behind the driver) was over the white line.

The white line creates a bright line when it comes to lawful parking. If you're not inside the white line, you're in the street. And if you're parked in the street, you're parked unlawfully.

The body-camera footage shows the parking job. The back wheel on the driver's side was hanging over the white line marking the parallel parking area from the roadway. The video

4

includes lots of images showing Black's car over the line and on the street. *See, e.g.*, *id.* at 0:38-40, 1:26-31, 2:27, 2:54, 3:13, 4:47. Here is an example:



*Id.* at 1:26.

Take a look at another screenshot from the body-camera footage, from a different angle. To get a sense of the distance, compare the width of the wheel to the distance between the wheel and the curb. If the width of the wheel were a unit of measurement, Black's car appears to be at least two wheel-widths away from the curb, or maybe more:



*Id.* at 2:27. On the left, the white line is under the car. On the right, the tire is far from the curb.

Notice that the pavement in the parking area has two color tones. The street is paved with asphalt, and the curb is concrete. The asphalt is a darker color, and the concrete is a lighter color. The color differences help to show that the back tire was a couple feet from the curb.[3]

---

[3] Notice the concrete area between the elevated curb and the asphalt street (meaning the flat surface on the side of the road, before the curb rises to the sidewalk) (sometimes, gutters are there). In Chicago, based on some experiments by clerks with tape measures, that flat concrete area is usually about a foot wide, or a little more. So, to park within 12 inches from the curb – meaning the elevated concrete – a car needs to be pretty close if not next to the flat concrete surface. That is, a car needs to be by the edge of the (black) asphalt. The asphalt begins about a foot away from the curb.

Consider the same car from one more angle. This image shows Black standing by a parking meter, staring at his car as it stood several feet from the curb:



*See* Clay Video, at 2:02.

The footage shows that the front end of Black's car appears closer to the curb than the rear end of the car. *Compare id.* at 0:38-40, 1:26-31, 3:13, *with id.* at 4:47. So, it appears that Black angled the front end of the car toward the curb as he was parking, but he didn't take the time to straighten things out.

By way of comparison, the other driver appears to have legally parked his car. One of the body-worn cameras includes a shot of the other driver's car. *See* Giesel Video, at 4:51. Unlike Black's car, the other driver's vehicle was off the road, and well within the white line on the side of the street:



*Id.*

By the look of things, Black's car was not merely in the street. The back of the car was over the line and in a bike path. As the government points out, the body-camera footage includes an image looking down the street. And it appears to show a painted symbol for a bike path. *Id.* at 4:56. That conclusion is consistent with a picture of the street from Google maps. *See* Gov't Supp. Resp., at 3 (Dckt. No. 47).[4]

---

[4] As Defendant rightly points out, the City of Chicago has different designations for different types of areas for bicycles. *See* Black Add'l Supp. Resp., at 3–7 (Dckt. No. 46). A "bike lane" is different than a "marked shared lane," which is different than a "contraflow bike lane" and a "bicycle priority lane." *See generally https://chicagocompletestreets.org/streets/bikeways/other-bikeways/* (last viewed Sept. 11, 2023) ("Other Bikeways consist of bike lanes, marked-shared lanes, contraflow bike lanes and bicycle priority lanes. Bike lanes are striped, on-street lanes with a bicycle symbol and an arrow. Marked shared lanes are not striped but show the bicycle symbol and a chevron; they are typically installed when there is not enough width for a full bike lane. Contraflow bike lanes are designated bike lanes marked to allow bicyclists to travel against the flow of motor vehicle traffic on a one-way street. Bicycle priority lanes are a shared lane treatment designed by a shared lane marking outlined with dashed lines in the middle of a travel lane.") (showing pictures, too). Here, the images of 35th Street show the bike symbol, but no

Testimony confirmed what this Court can see with its own eyes. During a suppression hearing in state court (more on that later), one of the arresting officers (Officer Giesel) testified that Black parked over the line. "The wheels of the vehicle were over the line, so they were in the road and not in a parking spot." *See* State Mtn. to Suppress Transcript, at 31:7-8 (Dckt. No. 26-1). The officer also testified that "[t]here's marked lines on the road, and you're supposed to park within those lines. If you don't park within those lines, you're in the road." *Id.* at 32:9-11; *see also id.* at 37:20-23 ("In this situation, there's a marked parking spot by a solid white line, and you're supposed to park within the white line. Outside of that line is in the road.").

Putting these facts together, and based on the record as a whole, the Court makes the following factual findings. Based on the video and the testimony, Black parked his car on the side of the road, but he did not lawfully park his vehicle. The car was not inside the white line separating the road from the parking spots by the parking meter. Instead, the car was over the line and on the street, at least in part. It was in a bike path, too. Black parked his car more than 12 inches from the curb, and then some.

Black's car crossed a line, literally and figuratively.

So the officers encountered a driver (Black) who needed to go into custody, and who put his car where it couldn't be. The car needed to move because it couldn't stay where it couldn't be.

Officer Giesel then revealed that the police planned to tow the cars. He announced: "both cars are probably gonna have to come with us. I think. We're gonna figure this out right now. But the car might have to come with us." *See* Giesel Video, at 3:19-27.

---

separate striped on-street lanes (meaning white lines on each side, marking a bikers-only area). So, the area was a "marked shared lane" because both bikes and cars could use it. At the end of the day, it is a distinction without a difference. The Municipal Code prohibits parking in a bike path or a bike lane, and authorizes the towing of any vehicle that violates the rule. *See* Chicago Mun. Code § 9-40-060(a)(2), (3).

Officer Giesel repeated the point about the other motorist's car. He said: "The car is probably gonna have to come with us to the district." *Id.* at 4:06-10.

Before moving the vehicle, officers briefly searched Black's car. Before long, Officer Giesel found a loaded handgun in the center console, right next to the driver's seat. *Id.* at 5:18-21. He located the weapon in roughly twenty-two seconds. *Id.* at 4:56 – 5:18. The gun had 11 rounds, including one in the chamber. *See* Incident Report (Dckt. No. 46-2).

Officers later drove Black's car to the police station. *See* State Mtn. to Suppress Transcript, at 17:15 – 24:36 (Dckt. No. 26-1). The officers ordered a tow from the police station later that night. Officer Giesel completed a tow report listing the reason for the tow as "arrestee's property." *See* Tow Report (Dckt. No. 47-1).

Officer Giesel later explained (in the state suppression hearing) why the police towed the car. He testified that officers had to tow it because "[i]t's arrestee's property. He was driving the vehicle, and we had to take the car – the car has to be towed and inventoried." *See* State Mtn. to Suppress Transcript, at 39:19-24 (Dckt. No. 26-1). It was "standardized police procedure." *Id*. at 39:20 – 40:2; *see also id.* at 40:20-23, 41:6-12.

Officer Giesel testified that they needed to tow Black's car partly because they didn't "want to be held responsible for his vehicle to be left in a place that he didn't want it to be left. So to cover us, we tow the vehicle." *Id.* at 40:24 – 41:5.

Officer Giesel also explained that Black had not paid the parking meter, and would have accrued tickets while in custody. Officers did not know when Black would be able to move the car given that he was arrested on an active arrest warrant. *Id.* at 42:13-23, 43:16 – 44:13. The car was uninsured, too, so no one could drive it. *Id.* at 42:4-8.

The discovery of the firearm led to charges in state court for possession of a weapon. Black challenged the search in a motion to suppress.

A state court judge presided over an evidentiary hearing. Officer Giesel testified. *Id.* at 5:4 – 57:10.

The state court ultimately granted Defendant's motion and suppressed the firearm. The court acknowledged that "it is true that the rear driver's side window [*i.e.*, wheel] was to the left of the lane [*i.e.*, the parking line]." *Id.* at 73:12-13. But the court granted the motion because the car was not blocking traffic: "My review of the video does not convince me that the car had to be towed. . . . I'm not convinced that the car was obstructing traffic." *Id.* at 73:11-17.

Black was later indicted in federal court for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). *See* Indictment (Dckt. No. 1). Once again, Black moved to suppress the firearm recovered from his car. *See* Mtn. to Suppress (Dckt. No. 25).

This Court later presided over a hearing, posed a number of questions, and directed the parties to file supplemental submissions. No party requested another evidentiary hearing.

**Analysis**

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

The standard for reasonableness is objective, not subjective. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action. The officer's subjective motivation is

11

irrelevant." *Stuart*, 547 U.S. at 404 (cleaned up) (emphasis in original); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011) ("We ask whether 'the circumstances, viewed objectively, justify [the challenged] action.' If so, that action was reasonable '*whatever* the subjective intent' motivating the relevant officials.") (brackets and emphasis in original); *Whren v. United States*, 517 U.S. 806, 814 (1996). "This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts, and it promotes evenhanded, uniform enforcement of the law." *al-Kidd*, 563 U.S. at 736.

The Fourth Amendment "reasonableness standard is objective, in the sense that it is the facts and circumstances presented to the officer at the time of the conduct at issue, rather than the officer's subjective intent, that matter." *Doxtator v. O'Brien*, 39 F.4th 852, 860 (7th Cir. 2022). Reasonableness is "'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Turner v. City of Champaign*, 979 F.3d 563, 567 (7th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The Supreme Court recognized long ago that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *See Payton v. New York*, 445 U.S. 573, 585 (1980). But the Fourth Amendment is not limited to homes. That much is clear from the text, which protects the right of the people to be secure in their "persons, houses, papers, and effects." *See* U.S. Const. amend. IV.

A person's "effects" include vehicles. *See South Dakota v. Opperman*, 428 U.S. 364, 367 (1976). Towing a car is a seizure, so the decision to tow a car must pass muster under the Fourth Amendment. *See United States v. Duguay*, 93 F.3d 346, 351 (7th Cir. 1996). A search of a car must pass muster, too. *Id.*

"Both the decision to take the car into custody and the concomitant inventory search must meet the strictures of the Fourth Amendment." *Id.* So, "the decision to impound (the 'seizure') is properly analyzed as distinct from the decision to inventory (the 'search')." *Id.*

The Court will address the seizure of the car, and then the search.

## I. The Seizure

The Court begins with the officers' decision to tow and impound Black's car. Taking the car was a seizure under the Fourth Amendment. So, the seizure must satisfy the Fourth Amendment's reasonableness requirement.

Police may tow cars "[i]n the interests of public safety and as part of what the [Supreme] Court has called 'community caretaking functions.'" *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976); *see generally Cady v. Dombrowski*, 413 U.S. 433 (1973). For example, the community caretaking function allows officers to remove "disabled or damaged vehicles" and "automobiles which violate parking ordinances." *Opperman*, 428 U.S. at 368–69.

A parking violation is a run-of-the-mill reason to tow a car. "Police will also frequently remove and impound automobiles *which violate parking ordinances* and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic." *Id.* (emphasis added). Streets need order, and order requires rules. A failure to follow the rules of the road is a reason for towing a car off the road.

Arrests often lead to towing a vehicle when the arrestee is the driver. "Police often impound vehicles found by them in public or semi-public areas in order to safeguard the vehicle and its contents for the owner. This sometimes occurs . . . when the owner or operator of the vehicle has been arrested while in or near the car." *See* Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 7.3(c) (6th ed. Oct. 2022 update) (footnote omitted).

The Seventh Circuit has provided guidance on when towing a car will satisfy the Fourth Amendment's community caretaking exception.[5] One question is whether the vehicle has a nexus to the criminal activity, meaning the reason why the driver is placed under arrest. *See Duguay*, 93 F.3d at 353 (noting that the decision to impound a vehicle could be "supported by probable cause of criminal activity"). The police might have probable cause to believe that the car contains contraband, or *is* contraband. *See Thompson v. Village of Monee*, 110 F. Supp. 3d 826, 843 (N.D. Ill. 2015) (St. Eve, J.). The police might have a basis to tow the car because of a connection to the reason for the arrest.

If not, then the next question is whether the car can stay where it is when the driver is arrested. The Seventh Circuit in *Duguay* referred to the "speedy and efficient removal of the car from public thoroughfares or parking lots," which presupposes that the car *needed* to be moved in the first place. *Id.*

But sometimes, the community caretaking function does not require a car to move. By way of example, imagine if Black had pulled his car into his own driveway, or the driveway of a friend's house, instead of a metered parking spot. The community caretaking rationale applies well to communal space, like a public street or private property that is open to the public (*e.g.*, a parking lot of a business). But the rationale seems to break down if the vehicle is on private residential property. *See Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005) ("[T]he vehicle was already parked in the Mirandas' home driveway. . . . Under these

---

[5] By way of comparison, the Tenth Circuit has framed the issue with a non-exhaustive list of factors. *See United States v. Sanders*, 796 F.3d 1241, 1250 (10th Cir. 2015) ("Ascertaining whether an impoundment is justified by a reasonable and legitimate, non-pretextual community caretaking rationale is not an easy task. We note that courts have considered the following non-exclusive list of factors: (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.").

circumstances, the Mirandas' car was not creating any impediment to traffic or threatening

public safety.  An officer cannot reasonably order an impoundment in situations where the

location of the vehicle does not create any need for the police to protect the vehicle or to avoid a

hazard to other drivers."); *United States v. Sanders*, 796 F.3d 1241, 1251 (10th Cir. 2015)

(rejecting the community caretaking rationale for towing a car that was "legally parked on

private property"); *Thompson*, 110 F. Supp. 3d at 843 (St. Eve, J.) ("A vehicle parked inside of

the owner's garage (or even on their driveway) does not typically present the public safety or

community caretaker concerns necessary for reasonable warrantless seizure of a vehicle."); *see

also United States v. Caseres*, 533 F.3d 1064, 1075 (9th Cir. 2008) ("There was no community

caretaking rationale for the impoundment of Caseres's car.  The car was legally parked at the

curb of a residential street two houses away from Caseres's home.").

If the car has no nexus to the crime, and if the car can't stay where it is, then the police

must consider whether someone else is on hand who can lawfully drive the car.  "The decision to

impound an automobile, unless it is supported by probable cause of criminal activity, is only

valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car

from public thoroughfares or parking lots." *Duguay*, 93 F.3d at 353.

The Seventh Circuit shed light on the subject in *United States v. Cartwright*, 630 F.3d

610 (7th Cir. 2010).  There, the police pulled over a car for a traffic violation (it lacked an

illuminated license plate).  The driver pulled into a grocery store parking lot, but he didn't stick

the landing when it came to the parking job.  He stopped "between two rows of parking spaces

but not in a designated spot." *Id.* at 612.

The driver didn't have his driver's license, and he gave a name that the police could not

confirm. *Id.* So the police placed the driver under arrest. *Id.* The police then searched the back

15

seat and found a loaded semi-automatic pistol. *Id.* The police later towed the car and performed an inventory search. *Id.* ("Pursuant to IMPD policy, Stratman had the car towed, as Cartwright [the driver] was under arrest and Golliday [the passenger] did not have a driver's license.").

The Seventh Circuit upheld both the seizure of the car and the search. The officers followed standard procedure when they towed the vehicle. *Id.* The police had a policy of towing vehicles when the driver is placed under arrest. *Id.* at 614.

The fact that the police followed normal procedures was relevant under the Fourth Amendment. But it was not dispositive, either. *Id.* at 614 ("[T]he police followed IMPD policy in deciding to tow the car. While that fact is important, it is not dispositive for purposes of the Fourth Amendment. The existence of a police policy, city ordinance, or state law alone does not render a particular search or seizure reasonable or otherwise immune from scrutiny under the Fourth Amendment.").

The Seventh Circuit ultimately concluded that the decision to tow the car was reasonable because no one else was on hand to move the car. The driver was under arrest, and the passenger had no driver's license. *Id.* at 615. Someone had to move the car, but no one could do it. The arrestee had "no means of ensuring the 'speedy and efficient' removal of [the passenger's] car from the parking lot." *Id.* (quoting *Duguay*, 93 F.3d at 353).

The Seventh Circuit implicitly recognized that the car couldn't stay where it was. It was in a parking lot, after all. A parking lot is private property. And again, the driver put the car in an awkward spot, "between two rows of parking spaces but not in a designated spot." *Id.* at 612.

The Fourth Amendment did not require the police to leave a vehicle in a bad spot after placing the driver under arrest. The police were not "obliged to leave the car where it was – stopped between two rows of parking spaces – as this may have created a hazard to others using

16

the lot or rendered the police vulnerable to claims had the car been stolen, vandalized, or damaged." *Id.* at 615 n.1; *see also id.* (citing a district court opinion for the notion that the police may "need to impound a vehicle for the purpose of protecting it after the arrest of the driver, even when the vehicle was parked in a private lot").

The Seventh Circuit also brushed off a suggestion that the owner of the parking lot would not mind if the car had stayed put. "At oral argument, Cartwright's lawyer advised that the grocery store permitted abandoned vehicles to remain in the parking lot for seventy-two hours, possibly enough time for [the owner of the car] to find a licensed driver or fix the license plate lamp. However, the Fourth Amendment did not require the officers to explore such alternatives with the store owner." *Id.*

The case at hand is only a stone's throw from the Seventh Circuit's decision in *Cartwright*. There, the police arrested a driver who put his car in a bad location in a public space, and no one was there to rescue the car. So too here. The police placed Black under arrest, and the car could not stay where it was because Black parked in the street. No one else was there to drive the car. So the police had a reasonable basis to tow it.

Towing Black's car followed standard procedures. For starters, the Illinois Motor Vehicle Code authorizes the towing of a vehicle when the driver is arrested and when the car is on the public streets. *See* 625 ILCS § 5/11-1302(c)(3) ("Any police officer is hereby authorized to remove or cause to be removed to the nearest garage or other place of safety any vehicle found upon a highway when . . . the person driving or in control of such vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before a proper magistrate without unnecessary delay."); *see also Duguay*, 93 F.3d 346, 354 n.3 (noting when the statute authorizes towing).

Black's parking job violated the municipal parking regulations, too. The Chicago Municipal Code makes it illegal to park more than a foot from the curb when parallel parking. "It shall be unlawful to stand or park any vehicle, except for a motorcycle or motor scooter, in a roadway other than parallel with the edge of the roadway headed in the direction of lawful traffic movement and *with the curbside wheels of the vehicle within 12 inches of the curb or edge of the roadway* . . . ." *See* Chicago Mun. Code § 9-64-020(a) (emphasis added). A car that is parallel parked cannot be more than 12 inches from the curb.

The Chicago Municipal Code permits towing a car that is parked too far from the curb. *Id.* at § 9-64-250(a) ("Any vehicle parked, stopped, or standing in violation of any provision of Section[] . . . 9-64-020 . . . shall be subject to an immediate tow as provided in Section 9-92-030.").

A local ordinance also prohibits parking in a bike path or lane. "The driver of a vehicle shall not: (i) stand or park a vehicle upon any on-street path or lane designated by official signs or markings for the use of bicycles; [or] (ii) stand or park upon any lane designated by pavement markings for the shared use of motor vehicles and bicycles." *Id.* at § 9-40-060(a)(2). If a car is parked in a bike path or lane, the police can tow it immediately. *Id.* at § 9-40-060(a)(3) (providing that "any vehicle parked in violation of subsection (a)(2) shall be subject to an immediate tow and removal to a city vehicle pound or authorized garage").

The Chicago Police Department also has standard procedures allowing officers to tow an arrestee's vehicle if the car is parked illegally. Police policy permits the "[t]ow of an arrestee's vehicle" if "the vehicle cannot be legally, securely, and continuously parked at the scene of the arrest." *See* Chicago Police Dep't Gen. Order G07-03, at § IV.G.1 (Dckt. No. 31-2, at 5 of 8) ("A vehicle related to an arrest will be towed if . . . the vehicle cannot be legally, securely, and

18

continuously parked at the scene of the arrest . . . .").  Simply put, the policy allows officers to tow an illegally parked car when placing the driver under arrest.

Based on a review of the body-camera footage, the Court finds that Black's car was more than 12 inches from the curb.  *See Giesel Video*, at 0:38-40, 1:26-31, 2:27, 2:54, 3:13, 4:47; Bourgoyne Video, at 0:30.  Frankly, it is not close.  The car was not close to the curb.  And the question of fact is not close, either.

Again, the back wheel on the passenger side was several feet from the curb.  The distance was greater than 12 inches.  By parking too far from the curb, Black put his car in a precarious position.  The back wheel on the driver's side was over the line, sticking out into the street.  It crossed the line and interfered with a bike path.

The Court's conclusion that Black's car was more than 12 inches from the curb means that it violated local parking rules.  So under the Municipal Code, and under the policy of the Chicago Police Department, the officers could tow it.  Black's car was not in a place where it could "legally, securely, and continuously" remain.  *See Chicago Police Dep't Gen. Order G07-03*, at § IV.G.1 (Dckt. No. 31-2, at 5 of 8).  In other words, the officers at hand followed a standardized policy by towing a car that violated the rules.

It makes no difference whether the officers were subjectively thinking about the parking violation at the time of the towing.  Subjective intent does not matter.  *See Stuart*, 547 U.S. at 404; *al-Kidd*, 563 U.S. at 736; *see also United States v. Coccia*, 446 F.3d 233, 240–41 (1st Cir. 2006) ("A search or seizure undertaken pursuant to the community caretaking exception is not infirm merely because it may also have been motivated by a desire to investigate crime.").

Objective reasonableness is what counts.  And here, the officers had an objectively reasonable basis to tow Black's car because Black parked his car partially in the street.  In any

event, at the evidentiary hearing, one of the arresting officers testified that "[t]he wheels of the vehicle were over the line, so they were in the road and not in a parking spot." *See* State Mtn. to Suppress Transcript, at 31:7-8 (Dckt. No. 26-1).

Black does not challenge the constitutionality of the City's parking rules, and for good reason. The Fourth Amendment does not prohibit a municipality from drawing lines and towing a car that violates parking regulations. *See Opperman*, 428 U.S. at 369 ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."); *United States v. Cherry*, 436 F.3d 769, 774 (7th Cir. 2006) ("And, because the car was located alongside the interstate – where it presented a public safety hazard – the police were authorized to order it towed to a safe location. Their authority to order such a tow in the interest of public safety is unassailable.").

The Fourth Amendment does not prohibit municipalities from having boundaries on where cars can be parked. Streets require lines. And crossing a line has consequences, in life and in the law. It does not cross a constitutional line to tow a car that is parked over the line. The Fourth Amendment does not bless bad parking jobs.

Instead, Black tries to defend the placement of the car. As he see it, "[t]he vehicle was no longer parked upon the roadway, but rather was parked in a lawful parking space." *See* Black's Mem. in Supp. of Mtn. to Suppress, at 5 (Dckt. No. 26). He contends that "[t]here was no reason to believe that the vehicle had to be removed from its parked and locked position." *Id.*

The Court respectfully sees things differently. It is true that Black's car was *mostly* in a parking space. But it is equally true that Black parked his car over the line. A car that is *mostly* legally parked is, well, *illegally* parked. When it comes to whether a car is lawfully parked, the answer is binary: either it is, or it isn't. And here, it wasn't.

True, the typical penalty for parking too far from a curb is a $25 fine. *See* Chicago Mun. Code § 9-100-020(b). But nothing limits officers' discretion to decide to tow the car instead. Officers are "not constitutionally required to select the least intrusive way of fulfilling their community caretaking responsibilities." *United States v. Sylvester*, 993 F.3d 16, 24 (1st Cir. 2021) (quotation marks omitted); *see also Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987).

Other courts have recognized that the police can tow a car when the driver is under arrest, and no one else can move the car. Decades ago, then-Judge Breyer recognized the "many precedents finding police impoundment to protect a car from theft or vandalism reasonable, and hence lawful." *See United States v. Ramos-Morales*, 981 F.2d 625, 626 (1st Cir. 1992) (Breyer, J.).

"Case law supports the view that where a driver is arrested and there is no one immediately on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car." *Jaynes v. Mitchell*, 824 F.3d 187, 197 (1st Cir. 2016) (Souter, J.) (emphasis in original) (quoting *Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 41 (1st Cir. 2003)).

Writing for the First Circuit, Justice Souter went further, suggesting that the police could tow a car if it "eventually" would have violated a parking regulation. "With [the arrestee] detained for an indeterminate period at the police station, and with no one immediately forthcoming to take possession, the police could reasonably enough have concluded that the car, which, incidentally, *would have incurred a parking violation eventually*, needed to be moved." *Id.* (emphasis added).

By the same token, the Eighth Circuit has held that "[p]olice may take protective custody of a vehicle when they have arrested its occupants, *even if it is lawfully parked and poses no*

*public safety hazard*." *United States v. Arrocha*, 713 F.3d 1159, 1163 (8th Cir. 2013) (emphasis added) (quotation marks omitted).

Next, Black argues that he requested to call his wife to come and move his car. *See* Black Supp. Resp., at 3 (Dckt. No. 46). "The defendant told the officers that his wife would come take the car, early on, when they said they were placing him under arrest for a warrant." *Id.*

This argument fails for at least two reasons.

First, as a factual matter, the body camera footage does show Black asking to call his wife, but nowhere does Black say that he wanted to call his wife *to move his car*. *See id.* at 3 & n.2; Clay Video, at 2:03. Black does not point to evidence that he told officers that his wife could move his car. What's more, nothing in the record shows that his wife was willing and able to move the car at that time.

Second, as a legal matter, the police had no obligation to wait for someone else to arrive and take the keys. "[T]he police need not give a motorist 'an opportunity to make alternative arrangements' that avoid impoundment and inventory." *Cartwright*, 630 F.3d at 615 (quoting *Colorado v. Bertine*, 479 U.S. 367, 373–74 (1987)); *see also Cherry*, 436 F.3d at 775 (noting that the Fourth Amendment does not "demand that police offer a motorist an alternative means of removing his vehicle that will avoid the need to tow it and conduct an inventory search"); *United States v. Arrocha*, 713 F.3d 1159, 1164 (8th Cir. 2013) ("Nothing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory.") (quotation marks omitted).

After all, when "a driver is arrested and there is no one <u>immediately</u> on hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car."

*Jaynes*, 824 F.3d at 197 (emphasis in original). The police had a basis to tow the car, and the Fourth Amendment did not require them to wait for another driver.

Black relies heavily on the decision by the state court to suppress evidence of the firearm. *See* Black's Mem. in Supp. of Mtn. to Suppress (Dckt. No. 26). The Court acknowledges that the state court reached a different decision about whether to suppress evidence of the firearm.

The state court focused on whether Black's car was impeding traffic. The state court explained its ruling as follows: "My review of the video does not convince me that the car had to be towed. . . . I'm not convinced that the car was obstructing traffic." *See* State Mtn. to Suppress Transcript, at 73:11-17 (Dckt. No. 26-1).

Respectfully, this Court sees things differently because this Court frames the question differently.[6] The question is not whether the car was blocking traffic. The question is whether Black's car was legally parked and could remain where it was. Or more precisely, the question is whether it was reasonable under the Fourth Amendment to tow Black's car when it was violating a municipal parking ordinance. This Court concludes that it was.

Impeding traffic is a sufficient reason to tow a car. But impeding traffic is not a *necessary* reason to tow a car. That is, the police can tow a car for other reasons, too. Other permissible reasons include parking violations. The police can tow a car for violating a municipal parking ordinance, even if the car is not blocking traffic.

---

[6] This Court is not bound by the state court's ruling on a motion to suppress about a federal constitutional issue. *See Elkins v. United States,* 364 U.S. 206, 223–24 (1960) ("In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."); *see also United States v. Rainone*, 816 F.3d 490, 496 (7th Cir. 2016); *United States v. Redwood*, WL 3345546, at *3 (N.D. Ill. 2016) (St. Eve, J.) ("The state court's probable cause determination [] is irrelevant [under *Elkins*]. . . . [T]his Court must conduct an independent probable cause inquiry").

For example, in *Opperman* the Supreme Court upheld the decision to tow a car that received two parking tickets for parking in a zone that prohibited parking from 2 a.m. to 6 a.m. *See Opperman*, 428 U.S. at 365–66.

Similarly, in *Cartwright*, the Seventh Circuit upheld the decision to tow a car parked in a parking lot "between two rows of parking spaces but not in a designated spot." *Cartwright*, 630 F.3d at 612. The Fourth Amendment permitted the officers to tow the car because leaving it in the parking lot "rendered the police vulnerable to claims had the car been stolen, vandalized, or damaged." *Id.* at 615 n.1.

The Seventh Circuit has recognized the authority of the police to tow a car that may "present[] a public safety hazard." *See Cherry*, 436 F.3d at 774 (noting that the "authority to order such a tow in the interest of public safety is unassailable"). A car can present a safety hazard even if it is not blocking traffic in the middle of the street. A car could hit a vehicle that is partially parked in the street. So could bikers.

Simply put, whether Black's car was impeding traffic is part of the analysis, but it is not the end of the analysis. A car that impedes traffic can be towed. But cars that violate local parking ordinances can get towed, too. *See Opperman*, 428 U.S. at 365–66.

In a similar vein, the question is not whether Black's car "had to be towed." *See* State Mtn. to Suppress Transcript, at 73:11-17 (Dckt. No. 26-1). The question is whether the decision to tow the car was reasonable. *See United States v. Treisman*, 71 F.4th 225, 234 (4th Cir. 2023) ("[W]e ask 'not whether there was a need for the police to impound [Treisman's] vehicle but, rather, whether the police officer's decision to impound was reasonable under the circumstances.'") (citation omitted). It was.

At the end of the day, Black crossed a line, but the police officers did not.  Black moved his car out of the middle of the road.  But in doing so, he parked illegally.  The police legally towed an illegally parked car.  The officers' decision to tow Black's car was reasonable under the Fourth Amendment.

## II.     The Search

Next, the Court considers whether the officers' decision to search the car satisfied the Fourth Amendment.

The Supreme Court "has traditionally drawn a distinction between automobiles and homes or offices in relation to the Fourth Amendment."  *See Opperman*, 428 U.S. at 367.  "Although automobiles are 'effects' and thus within the reach of the Fourth Amendment, warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not."  *Id.* (citation omitted).

Towing a vehicle is a prime example of when homes and cars receive different treatment.  Unlike homes, vehicles frequently get taken into custody.  The possession of a vehicle by the police gives rise to a need for an inventory search.  "When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents."  *Id.* at 369.

The Fourth Amendment allows officers to search a vehicle at the scene "for inventory assessment before its impoundment."  *See United States v. Martin*, 360 F. App'x 686, 688 (7th Cir. 2010).  "In applying the reasonableness standard adopted by the Framers, [the Supreme] Court has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process is aimed at securing or protecting the car and its contents."  *Opperman*, 428 U.S. at 373.

25

"An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage." *Wren v. United States*, 517 U.S. 806, 811 n.1 (1996). An inventory search "protects the police from potential danger, protects the owner's property while it remains in police custody, and protects the police against claims of lost, stolen, or damaged property." *Cartwright*, 630 F.3d at 614; *see also Bertine*, 479 U.S. at 372.

"Warrantless inventory searches of cars in police custody are also proper as long as the police lawfully have custody of the vehicles." *Cherry*, 436 F.3d at 775 (quoting *United States v. Jensen*, 169 F.3d 1044, 1048 (7th Cir. 1999)). "Inventory searches constitute a well-recognized exception to the warrant requirement and are reasonable under the Fourth Amendment." *Cartwright*, 630 F.3d at 613.

"Once a car is impounded, an inventory search follows as a matter of course in prudent law enforcement practice, if for no other reason than to make a record to protect the police against a later claim that custodial negligence allowed the loss of valuable personal property by theft or otherwise." *Jaynes*, 824 F.3d at 197.

When evaluating the reasonableness of a search, one of the considerations is whether the police followed standard procedure. *See Opperman*, 428 U.S. at 375 (noting that whether the police followed standard procedures is "a factor tending to ensure that the intrusion would be limited in scope to the extent necessary to carry out the caretaking function"). "An inventory search is lawful if (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures." *Id.*

"Searches conducted by the police prior to towing a car are 'lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property – and protecting the police from the owner's charging them with having stolen, lost, or damaged his property.'" *United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006) (quoting *United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005)). But "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4 (1990).

So, once officers validly determine that the car is subject to a tow, they may conduct an inventory search as a matter of course. But like any other search, an inventory search must be reasonable within the meaning of the Fourth Amendment.

Black argues that the search of his car was unreasonable because the police did not follow standard protocols. As he sees it, the search that took place was not a formal inventory search at all. *See* Black Supp. Resp., at 3–7 (Dckt. No. 46).

Black points to the fact that the would-be inventory search was incomplete. The Tow Report includes a "Vehicle Inventory" section which is completed, but it appears to be marked as "unknown" whether any personal property is in the vehicle. *See* Tow Report (Dckt. No. 47-1). Also marked as unknown is information about the interior of the car, like whether the glove box was locked. *Id.*

As Black sees it, "the evidence does not show that the officers complied with a policy. Not a single personal item was removed from the car and inventoried. They looked for a gun, found it, then disregarded everything else." *See* Black Supp. Resp., at 9 (Dckt. No. 46).

Black is correct that police policy requires officers to "remove and inventory personal property found within the vehicle" when ordering a tow. *See* Chicago Police Dep't Gen. Order

27

G07-03, at § IV.A.7 (Dckt. No. 31-2, at 4 of 8). Police policy also requires that "[t]he property inventory number will be indicated on the Vehicle Tow Report," which wasn't done here. *Id.*

Even so, the potential incompleteness of the inventory search does not mean that the entire search was unconstitutional. A search that violates local police rules can comply with the Fourth Amendment. *See Marling v. Littlejohn*, 964 F.3d 667, 669 (7th Cir. 2020). On the flipside, a search that complies with local police rules can violate the Fourth Amendment. *See Cartwright*, 630 F.3d at 614. The circles overlap, but they're not perfectly coextensive.

Instead, the importance of following "standardized criteria or established routine" during an inventory search "is based on the principle that an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Marling*, 964 F.3d at 669 (quoting *Wells*, 495 U.S. at 4).

When conducting an inventory search, "minor deviations from department policy do not render an inventory search unreasonable." *Cartwright*, 630 F.3d at 616; *see also United States v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020) ("Inventory searches that materially deviate from department policy can be invalid. However, minor noncompliance with department policies does not invalidate an otherwise lawful inventory search.") (citation omitted).

These minor deviations include "failing to make a complete list of the property found" in the car. *Cartwright*, 630 F.3d at 616; *see also United States v. Garay*, 938 F.3d 1108, 1112 (9th Cir. 2019) (collecting cases holding that the "failure to complete an inventory form does not invalidate an inventory search").

Here, the officers' failure to conduct a complete inventory search does not invalidate the search. The officers failed to make a complete list of the items in Black's car. This failure,

standing alone, does not invalidate the search.  *See Cartwright*, 630 F.3d at 616.  It is not surprising that the loaded firearm garnered special attention, and the police stopped looking.

Maybe the police could have performed a more exhaustive search of the vehicle.  Maybe the police could have done more looking, and itemized more property after finding the gun. Even so, it makes no difference.  The fact that the police could have done *more* does not mean that the police acted unlawfully when they did *less*.

Moreover, the failure to follow inventory procedures to a tee does not invalidate a search if "the police would inevitably have found the gun through a lawful inventory search." *Cartwright*, 630 F.3d at 616.  "Under the inevitable discovery doctrine, if the government can establish that the evidence at issue, even though unlawfully obtained, would have inevitably been discovered through lawful means, then the deterrence rationale animating the exclusionary rule has so little basis that the evidence should be admitted."  *Id.* at 613.

Here, the officers' decision to tow and impound the car was valid.  As a result, the gun inevitably would have been discovered through an inventory search that complied with the City's policies.  The incompleteness of the initial search would not matter, because the police would have located the firearm anyway.

### Conclusion

For the foregoing reasons, Defendant's motion to suppress evidence of the firearm (Dckt. No. 25) is hereby denied.


Date:   September 12, 2023

_____

Steven C. Seeger
United States District Judge

29